Bruce R. Raines Associates, Inc., Respondent-Appellant, v Whitman & Ransom, Appellant-Respondent.

First Department, June 28, 1988

## APPEARANCES OF COUNSEL

*Norman L. Rosenthal* for respondent-appellant.

*Gary P. Rosenthal* of counsel *(Whitman & Ransom,* attorneys), appellant-respondent *pro se.*

## OPINION OF THE COURT

SULLIVAN, J.

In May 1986, in response to a newspaper advertisement, Robert Thoms, an unemployed attorney with Middle East experience, contacted plaintiff, an executive and professional placement service, to solicit its assistance in procuring a legal position. Thoms then met with Renee Berliner Rush, the manager of plaintiff's legal search division, who contacted the defendant law firm and, after speaking with its managing partner, forwarded to him a copy of Thoms' resumé. Rush simultaneously wrote to Linda Rauzi, defendant's recruitment coordinator, advising her that plaintiff's fee with respect to associates is 25% of the associate's first year's compensation, including guaranteed bonus where applicable, "payable upon the commencement of such associate's employment with your firm."[1]

Thoms thereafter met with William Gnichtel, another partner of defendant, who, like Thoms, had spent some years working in the Middle East. A meeting was arranged between Thoms, Gnichtel and Salah Al-Hejailan (Salah), with whose law firm in Riyadh, Saudi Arabia, Gnichtel had been associated. Although defendant has various offices throughout the world, it is not clear from this record what relationship, if any, it has with Salah. Defendant claims that the relationship is limited to the occasional referral of business between the two firms.

In any event, negotiations took place among Thoms, Salah and Gnichtel during the summer and into the fall of 1986. An agreement resulted whereby defendant would sponsor Thoms

---

1. Although plaintiff had a different formula with respect to partners, Rush agreed that if Thoms were to "be considered for a partnership position in one of your foreign offices", he would be treated as an associate for fee purposes.

to serve as a full-time resident lawyer for Salah in Riyadh. This arrangement, characterized by the parties as a "secondment", was to be on a three-month trial basis through January 31, 1987, during which any of the parties could terminate the agreement, and after which defendant was to confirm Thoms' partnership status with it. Salah was to pay Thoms $6,500 in advance to cover his expenses in moving to Riyadh. After the trial period, the secondment was then to continue for a two-year term, commencing February 1, 1987, during which Salah was to provide Thoms with appropriate housing accommodations, furnishings and a car. He was to serve as the senior American lawyer in Salah's office and resume Gnichtel's role as a principal lawyer for certain specified clients, including Saudi American Bank and General Motors. Salah was to pay Thoms $15,000 per month, as well as a monthly secondment fee of $4,000 to defendant as long as Thoms continued to be seconded. In addition, a productivity fee, based on billings, was to be paid to Thoms, who was to remit the same to defendant. It was left to Salah's discretion as to whether to pay defendant a percentage, from 7% to 15%, of "success fees" on account of its or Thoms' efforts in Salah's behalf. Collections by defendant on account of Salah referrals to its New York office, as well as amounts received by it as productivity fees, would be credited against the secondment fee.

By separate signed agreement, Thoms agreed to undertake "a special assignment for [defendant] to serve on a full-time basis as a foreign legal consultant, resident in Riyadh, to the Law Firm of Salah Al-Hejailan (LFSH)." It was further understood that the "terms of your secondment are set forth in a separate letter agreement (Secondment Agreement) between this Firm and LFSH", to the terms of which Thoms had agreed. It was expressly provided that the Thoms-defendant agreement was subject to defendant's receipt of a signed counterpart of the secondment agreement from Salah and that defendant would not be liable to Thoms if Salah breached the terms of the secondment agreement.

On October 24, 1986 Salah signed the formal secondment agreement, which had been forwarded to him by defendant on October 15, 1986, but only after he had unilaterally changed several of its terms. Notably, he had altered the two-year commitment to Thoms to an employment-at-will, terminable on one month's notice, and compromised the formula for computing the productivity fee to be paid defendant. Defen-

dant objected to these and other changes in the "agreement previously reached" and so informed Salah, who responded testily, complaining to Gnichtel that defendant had "always taken [his] verbal approval on various items" and ridiculing defendant's "insistence" that Thoms occupy Gnichtel's old office at the Salah firm and represent the same clients. Salah expressed his dissatisfaction with defendant's insistence on a formal agreement by noting, "Now it sounds to me that hiring a lawyer is somewhat similar to the importation of grocery produce."

In any event, after returning the signed secondment agreement, as modified, Salah advanced the $6,500 in moving expenses for Thoms, who arrived in Riyadh in early November 1986. Before departing, he wrote to Salah, on defendant's stationery, to express his disappointment at the parties' inability to conclude "this simple contract, revisions of which—almost exclusively in your favor—have consumed so much effort these past four months." Thoms underscored his understanding that by "accepting, as I have from the beginning, your declarations of your good faith * * * a far greater burden of honor [is placed upon you] than would our cooperating on the basis of a written agreement."

On November 3, 1986, defendant mailed for signature another copy of a secondment agreement including some but not all of Salah's changes. It included an acknowledgement of Thoms' receipt of the $6,500 allowance and a $15,000 advance on his monthly compensation. This document was never executed. As a result, defendant, by letter dated May 6, 1987, withdrew both its "proposed arrangement" as set forth in its November 3, 1986 letter and its commitment to make Thoms a partner at the conclusion of his trial period. As far as this record discloses, Thoms is still associated with Salah in Saudi Arabia. No secondment, productivity or success fee, however, has been remitted to defendant. Nor, in light of the May 6, 1987 withdrawal of its November 3, 1987 proposal, does defendant apparently expect to receive such fees.

Although defendant denies that it ever hired Thoms or that it has any employment commitment to him, in the Saudi Arabia section of the 1987 edition of Martindale-Hubbell, Thoms' name immediately follows Salah's under the Salah firm's listing. His biography includes a listing as a partner in the defendant firm. In that same edition, under defendant's listing, Gnichtel is listed as of counsel to the Salah firm in Riyadh, Saudi Arabia. Under a sublisting showing a Riyadh,

Saudi Arabia office, Thoms is listed as the resident partner. Gnichtel's explanation is that he furnished such information both as to the Salah firm and the defendant firm in November 1986 in order to meet Martindale-Hubbell's annual deadline for the 1987 edition. At the time, as he explains, "Thoms was leaving for Riyadh and Salah had given me oral assurances that when Thoms arrived [he] would sign the [secondment] agreement." According to Gnichtel, all references to Thoms' status with defendant, and any reference to Salah in its listing, as well as any reference to Gnichtel in Salah's listing with Martindale-Hubbell, would be removed from the 1988 edition. We take judicial notice that this, in fact, has been done.

■ When defendant refused to honor its invoice for $45,000, representing 25% of Thoms' annual salary, plaintiff commenced this action for breach of contract and unjust enrichment. After joinder of issue, both parties moved for summary judgment. Finding an issue of fact as to whether defendant employed Thoms, the motion court denied both motions. We modify to grant summary judgment to plaintiff.

Defendant argues that to have any right to a fee a recruiter must, at a bare minimum, show a hiring of his candidate by the employer. *(See, Costello Assocs. v Standard Metals Corp., 99 AD2d 227, appeal dismissed 62 NY2d 942.)*[2] Since Thoms is not and has never been its employee, defendant contends, a recruitment fee has not been earned. We do not agree.

Despite its disclaimer, this record clearly reveals that defendant hired Thoms in the fall of 1986, subject to Salah's execution of the proposed secondment agreement, as part of a tripartite arrangement which called for Thoms to undertake a special assignment for it as a legal consultant in Riyadh, Saudi Arabia. What defendant contemplated by this hiring was the creation of both a general and special employer/employee relationship. It has been held that an employee may have both a general and a special employer. *(Parke-Bernet Galleries v Franklyn, 26 NY2d 13; Matter of De Noyer v Cavanaugh, 221 NY 273; Matter of Kucharuk v McQueen, 221 NY 607.)* "The principles of law which control in this class of cases are quite well settled. A servant in the general employ-

2. Plaintiff, an executive and professional placement firm, which never charges the prospective employee a fee and only charges the prospective employer, clearly falls within the exemption of General Business Law § 171 (2) (e) (2) and is not required to be licensed.

ment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant of the borrower". *(Hartell v Simonson & Son Co.,* 218 NY 345, 349.) The doctrine has its origins in *Murray v Dwight* (161 NY 301, 310), in which it was held, "[O]ne who is the servant of the general master may, if employed elsewhere temporarily, *ad hoc,* become the servant of the special master and it is of no consequence whether he is loaned for the purpose, or whether he is hired, not directly, but through his general master."

That defendant was unable to obtain a firm written commitment from Salah to all the terms of its proposed secondment agreement does not detract from the fact that, insofar as plaintiff's rights are concerned, it hired Thoms for this special assignment. Not even Salah's reservations, as evidenced by his unilateral changes in the original October 15, 1986 draft, could dampen defendant's enthusiasm for the project. As is readily apparent, the benefits to it from such an arrangement would have been substantial. As one of its partners explained at his deposition, defendant could expect to receive referrals of a significant amount of legal business from the Salah firm, as well as "a certain over-ride" on the billings generated by Thoms for Salah. Moreover, all of this would have been accomplished without an ongoing cost to it. Indeed, defendant was still trying to reach an agreement with Salah on November 3, 1986 and acting as Thoms' second as Thoms, without the benefit of a written contract, was departing for Saudi Arabia. The issue was far from academic, as defendant concedes. As previously noted, Gnichtel fully expected that when Thoms arrived in Riyadh, Salah would sign the secondment agreement. In fact, defendant did not abandon its hopes for an agreement with Salah until six months later, when it dispatched its May 6, 1987 letter to him. It described its efforts at that point as "a good try but a failure."

Thus, the reality of the situation is that defendant hired Thoms for a special assignment to Salah, believing that Salah would agree to its terms with respect to the secondment. As between plaintiff, the placement service, and defendant, the law firm, the risk that Salah might refuse, as he ultimately did, or breach any contract he might have had with defendant, should not fall on plaintiff, which performed its obligations by providing a suitable candidate, who was found qualified and accepted for the position he was to fill. Its fee was fully earned at the commencement of the employment. Defen-

dant could easily have exempted itself from liability for the placement fee in the event the details of the secondment agreement could not be worked out to the parties' mutual satisfaction. It did not. Thus, for purposes of determining whether the placement fee had been earned, there had been a hiring of Thoms by defendant.

■ Under the terms of their agreement plaintiff is entitled to 25% of Thoms' first year salary of $180,000, or $45,000. That plaintiff previously offered to accept a reduced commission of $21,000 in settlement of its claim should not preclude a recovery on the whole amount, as to which, once a hiring is established, an issue of fact does not exist.

Accordingly, the order of the Supreme Court, New York County (Martin Evans, J.), entered October 6, 1987, denying the parties' motions for summary judgment, should be modified, on the law, to grant summary judgment to plaintiff in the sum of $45,000 and, except as thus modified, affirmed, without costs or disbursements.

MURPHY, P. J., ASCH, KASSAL and ELLERIN, JJ., concur.

Order, Supreme Court, New York County, entered on or about October 6, 1987, unanimously modified, on the law, to grant summary judgment to plaintiff in the sum of $45,000 and, except as thus modified, affirmed, without costs and without disbursements.